LOMAX (FRAZIER v.). See Case No. 5,072.
LOMBARD (AMERICAN WHIP CO. v.). See Case No. 319.

## Case No. 8,469.
### LOMBARD v. BAYARD.
[1 Wall. Jr. 196.] [1]
Circuit Court, E. D. Pennsylvania. April Term, 1848. [2]

LIEN OF JUDGMENT IN CIRCUIT COURTS — DUTIES AND COMPENSATION OF AUDITORS—RATES OF PROFESSIONAL CHARGES.

1. The lien of a judgment in this court is co-extensive with the district, and is not confined to the county of Philadelphia merely.
[Cited in Cropsey v. Crandall, Case No. 3,418; Ludlow v. Clinton Line R. Co., Id. 8,600; Ward v. Chamberlain, 2 Black (67 U. S.) 438.]

---

1 [Reported by John William Wallace, Esq.]
2 [Affirmed in 9 How. (50 U. S.) 530.]

2. The compensation of auditors is regulated not only by the labour which they have, but also by the amount of money to be distributed.

[Cited in Kelley v. Richardson, 69 Mich. 476, 37 N. W. 535.]

3. In this case the court speaks of the considerations which may properly influence professional charges.

The defendant's real estate, situate in Lancaster county, Pennsylvania, having been sold on an execution from this court in favour of Lombard, the plaintiff, a question arose between him and some other parties, junior incumbrancers, in the county court of Lancaster, where the lands are situate, as to who was entitled to take the money. Lombard contended that the judgment of this court was co-extensive, as an incumbrance, with the Eastern district of Pennsylvania; a position which, if true, would give the money to him, Lancaster county being within the district, and he the oldest incumbrancer. The Lancaster county creditors, on the other hand, contended that a judgment in this court was similar in its effects with a judgment in any of the state courts, and that it bound no lands out of the county where it was entered. The matter being referred, according to the Pennsylvania practice. to an auditor to report upon, that gentleman decided that the lien of this court's judgment was co-extensive with the district, though this embraces several counties besides that of Philadelphia, where the court sits. One exception, the first, was to his decision on this matter.

In the argument upon it, which was conducted by Mr. Penrose, Mr. Harris and Mr. B. H. Brewster in favour of the exception, and by Mr. Rawle and Mr. J. M. Read in favour of the report, a good deal of speculation was had about the origin of liens from judgments. It was admitted, however, that whencesoever the effect came, judgments had been liens in Pennsylvania ever since 1700 (1 Smith, Laws, 7, and notes), in which year an act of the state legislature made lands liable to sale on execution. It was admitted also that by the law of the state in 1789, when this court was constituted, a judgment in the supreme court of the state was a lien co-extensive with the state itself. Ralston v. Bell, 2 Dall. [2 U. S.] 158; White v. Hamilton, 1 Yeates, 183. It was also admitted that an act of the state legislature, April 4th, 1798, limiting the lien of judgments to five years, had been considered as applicable to judgments in this court, though the act was passed many years after this court was organized. Upon this last admission, the counsel for the exceptant grounded the strong point of their argument. The state, in the year following that when the last mentioned act was passed, enacted [8]

[8] Act March 20, 1799. "to enable the justices of the supreme court to hold circuit courts within this commonwealth." It established a circuit court in each county of the state except

that "no judgment rendered in the supreme court or in the circuit courts (of the state,) shall be a lien on real estate, excepting in the county in which such judgment shall be rendered." And the counsel for the exceptant contended that as this court had conformed to the state law concerning the duration of judgments, it was equally bound to conform to it when settling their extent: a position which it was supposed derived force from the testimony of Mr. Francis Hopkinson, lately the clerk of the court. who stated that from 1831 to 1846, during which term he had held office, it had never been customary to send for searches here when the land to be sold did not lie in Philadelphia county.

The counsel on the other side contended that the act was merely intended to prevent the evils which might arise from applying the established law about the lien of judgments to the system of state circuit courts, which that act established.

GRIER, Circuit Justice. In the conclusion to which the court comes as to the extent of the lien, we assume the following points, without attempting to fortify them by arguments or authorities:

1st. That the lien of judgments in the courts of the United States does not result from any direct legislation of congress on that subject.

2d. That under the judiciary act of 1789 [1 Stat. 73], which ordains (section 34) "that the laws of the several states shall be regarded as rules of decision at. common law in courts of the United States," these courts have uniformly adopted the principles of state policy and jurisprudence on the subject of the lien of judgments, so far as the same were applicable, treating them as rules affecting real property and its transmission, whether by descent or purchase. This doctrine is fully recognized by implication in several acts of congress touching this subject. Acts May 19, 1828, § 2 [4 Stat. 281], and July 4, 1840, § 4 [5 Stat. 393].

3d. That from the earliest history of Pennsylvania to the present time, judgments have been considered as liens upon land: and this not by adoption of the statute 13 Edw. I. c. 18, commonly called the "Statute of Westminster II.," or "statute of elegit" (Allen v. Reesor, 16 Serg. & R. 11), nor by virtue of the statute 2 Geo. II., but because from the first settlement of the colony, or at least since the year 1700, "all lands and houses whatsoever," were "liable to sale upon judgment and execution obtained against the defendant, the owner, his heirs, executors," &c. Act 1700.

4th. That in 1789, when the circuit courts

Philadelphia; each county to have a clerk, &c.; gives an appeal from each circuit to the supreme court in banc, and after the decision there requires the record to be returned below.

of the United States were established, the law of Pennsylvania was settled both by judicial decision and act of assembly, recognizing the doctrine (Act 21st March, 1772; 1 Smith, Laws, 389) that a judgment of a court of record bound the lands of the debtor situated within the territorial jurisdiction of the court for an indefinite period of time. Thus a judgment in the court of common pleas, whose jurisdiction by mesne process extended over a single county, was a lien on all the lands within that county only, and not over the state, although testatum executions might issue to any county. But judgments in the supreme court bound lands over the whole state. Ralston v. Bell, 2 Dall. [2 U. S.] 158; White v. Hamilton, 1 Yeates, 183.

5th. That the act of assembly, April 4, 1798, § 2, limiting the lien of judgment to five years unless revived by scire facias, has been considered as a rule of property binding on this court, and therefore adopted by it, although passed subsequent to 1789. Thompson v. Phillips [Case No. 13,974]. It results as a necessary conclusion from these admitted principles that the lien of a judgment in this court, in 1789, was co-extensive with the state, which was then the boundary of its jurisdiction by mesne process. But while this position is conceded, it is contended also that this court is bound to conform to the legislation of Pennsylvania since 1789, limiting the extent of the lien of a judgment in the same manner as we have already adopted it with regard to limitation of time; and the act of assembly, March 28, 1799, § 14, limiting the lien of judgments in the circuit and supreme courts of Pennsylvania to the county where they were rendered, is relied on as exhibiting the policy of the state on this subject, and constituting a rule which this court is bound to adopt. It is not necessary to decide, nor are we willing to concede, that if the legislature had enacted in direct terms that the lien of judgments in this court should be limited to the county of Philadelphia, we would have felt bound to conform to the enactment. But admitting this point for argument's sake, we cannot see that the act of assembly relied on has any, or was intended to have any, application to this court. It is not the enactment of a general principle or doctrine affecting real estate or liens in general, or establishing the incidents and effect of all judgments in all courts. But this section was introduced to guard against a great inconvenience which might arise by the application of the well known doctrines of the law in relation to the lien of judgments to the new system of circuit courts established by that act. It is entitled "An act to enable the justices of the supreme court to hold circuit courts within this commonwealth." It establishes a circuit court to be held in each county of the state except Philadelphia. Each county to have a clerk, seal, &c.

Gives an appeal to the supreme court in banc, and after the decision requires the record to be returned to the circuit court of the county, and execution to issue therefrom. Now, unless the act restrained the extent of the lien of a judgment in each of these forty county circuits to the limits of its territory, it was most probable that in consonance with the previous decisions of the supreme court touching the subject, the lien of a judgment in any one of these numerous courts would have been construed to affect lands over the whole state. This would have been not only a great inconvenience, but an intolerable evil, as purchasers would have been compelled to search for liens, not merely in the court of common pleas of the county where the land lay, and the supreme court, but in some forty or fifty others. To remedy this evil, the section of that act was introduced which is now under consideration. It enacts, that "from and after the last day of December term next, no judgment rendered either in the supreme court or any of the other said circuit courts, shall be a lien on real estates excepting in the county in which such judgments shall be rendered; and that every testatum execution shall be a lien upon lands and tenements only from the time of the delivery thereof to the sheriff, who is directed to endorse the precise time of receiving the same, and shall certify forthwith a transcript thereof, together with the day and time of such testatum execution coming to his hands, in and to the office of the clerk of the circuit court of the county in which such lands or tenements shall be, &c. &c." It needs no argument to show that this act annuls no established doctrine or principle, and sets up no new one which must bind all courts as a rule of property, and that it applies only to a peculiar system of courts then first established. It could not be intended to affect the lien of judgments in this court, nor can we adopt it according to its letter if we would. The evil guarded against is not incident to this court. Our jurisdiction is not bounded by the limits of a county, nor have we this multitude of places of holding our courts and keeping our records. We issue no testatum executions within this state. Counties, says Lord Coke, are parts of the kingdom into which the whole realm is divided for the better government thereof. Every of them is governed by a yearly officer called a "sheriff." The county is hence called his bailiwick. It is called "comitatus a comitando"; for as much as men of one county do not accompany together with men of another county at county courts, towns, leets and other courts, &c. As divisions of territory and jurisdiction for facility of the administration of justice by the tribunals of each state they are wholly unknown to the circuit courts of the United States, whose county is the state or district subject to their respective jurisdictions. The county or bail-

iwick of the marshal is the district. This court is not the circuit court of Philadelphia county, but of the Eastern district of Pennsylvania. The enumeration of counties in the act of congress constituting it is but for facility of designating its boundary.

So far as any general principle can be elicited from this act of assembly, affecting the doctrine of the lien of judgments which this court can apply it is no more than this: That the lien of judgments shall be co-extensive with the original jurisdiction of the court in which they are entered, that is the territory within which their mesne process runs, as distinguished from writs of execution. The adoption of this principle would limit the lien of our judgments to the Eastern district of Pennsylvania. But on this subject we are not without precedents establishing the position we have taken. The case of Shrew v. Jones [Case No. 12,818], is in point. An act of the legislature of Indiana, passed in 1824, limits the lien of judgments in the circuit court of that state to the counties in which the judgments were entered. And it was contended in that case as in this, that judgments in the circuit court of the United States should be subject to the same rule. But it was decided by Mr. Justice M'Lean, that this act could not apply in the manner contended for to judgments rendered in that court. "Effect," says he, "must be given to the provisions of this law, so far at least as they are adapted to the organization of this court. If the rules of the proceeding by the circuit courts of the state be followed by this court, effect is given to them without reference to the limited jurisdiction of these courts. The limits of the state in the exercise of the jurisdiction of this court are as the limits of the county to the local courts. The principles of the state law are adopted, but the instruments which give effect to these principles are necessarily different, and they are made to operate throughout a more extended jurisdiction. In Sellers v. Corwin, 5 Ohio, 400, the supreme court of Ohio decide that the lien of a judgment in the circuit court of the United States for Ohio was co-extensive with the territorial jurisdiction. The case of Koning v. Bayard [Case No. 7,924], in the circuit court of the United States in the Southern district of New York, and the case of Manhattan Co. v. Evertson, 6 Paige, 466, are to the same effect. Exception overruled.

This point being disposed of, a second exception was to the sum charged by the auditor for his services in the matter. Upon this part of the case it appeared that the parties had met informally three or four times before the auditor to agree upon and settle the exact state of some undisputed facts, but that no argument was had upon the point of law involved in the question of the lien; one of the counsel telling the auditor that he did not want anything but a pro forma report, so as to take the point of law before the court in the shape of an exception to the report, where it might be fully argued and settled.[4]

The auditor made a report of eighteen foolscap pages, in which he examined numerous authorities and stated his reasons for the conclusion to which he arrived; a conclusion which, as we have already seen, was confirmed by this court. He was a gentleman who had practiced with credit for several years at the country bar, and had recently established himself in this city, and his opinion, so far as the reporter could judge of it, was a very respectable production, in which the authorities were collected with a good deal of diligence. The fund in court was $60,333.80, and the auditor's charge, deducting his expenses, was about $225. The defendant had already paid $1,202 in costs, including a sum of $303.16 to the clerk for mere percentage.

Mr. Penrose, in behalf of the exception to the auditor's charge, contended that the charge was extravagant. The auditor was requested to confine himself to a pro forma decree merely. Counsel undoubtedly have a right to ask for such a decree; nor will the court impose upon suitors the expense of having cases decided by any tribunal but those regularly constituted courts of the country, which all are taxed to support. and by whose judgments all are willing to be bound. In the present case the defendant, having discharged legal costs amounting to more than $1,000, is compelled to pay $225 more—for what? An opinion of a private individual, of no authority nor value whatsoever to him or to any body. It is of no value to the court, who are bound to sit here, and have sat here, to listen to the argument of counsel on the point passed upon by the auditor, and to decide it exactly as if no report had ever been made. The auditor, finding that the sum was large, has gone into a voluminous disquisition, for no object, it would seem, but to give himself an apparent right to a large compensation. He was requested to state

[4] For the information of gentlemen not acquainted with the practice in Pennsylvania, it may be well to state that a portion of the duty of "auditors" usually is to make public advertisement in two newspapers of the fact of their appointments, and of the time and place of meeting, describing the property sold, and calling upon all persons interested in the proceeds of it to attend before them. They also usually procure from the different offices certificates of all incumbrances on the property, and, after making their report, send notices to the various parties or their counsel who have appeared before them, informing such persons that the report has been made, is ready to be seen, and requiring them if any exception is wished to be made, to except thereto within a certain time and in a certain way. The auditor collects and preserves the various evidences of this discharge of his duty, and for advertisements and searches sometimes pays money from his own pocket in advance.

the facts of the case, and to give a formal decree only. Now the magnitude of the sum in court is not a proper element for consideration in settling the auditor's recompense. His judgment is not made either more or less correct by that fact. But at any rate the sum was extravagant. It is well known that the most eminent members of this bar—among whom the auditor is not asserted to be—constantly give opinions on the most important points for sums varying from $10 to $50. In Fitzsimmons' Appeal, 4 Pa. St. 249, the charge of the auditor,—which was objected to by counsel,—was but $10. It is hoped, in short, that the court will lay its hand upon an abuse, which has been a grievous one in the inferiour courts of Philadelphia, and which, unless speedily arrested, will justify all the feeling which it has provoked. It has there already come to the condition which made Lord Eldon say of the English bankruptcy system in 1801 (6 Ves. Jr. 1) that there "is no mercy to the estate"; that "nothing is less thought of than the object of the commission," and to speak of it as "little more than a stock in trade for the commissioner, the assignees and the solicitor."

Mr. J. M. Read, for auditor, stated that this gentleman desired to refer himself entirely to the judgment of the court in the matter, and had nothing to reply to what had been said.

GRIER, Circuit Justice. That the auditor is entitled to a reasonable compensation for his services cannot be denied. The objection here is to the amount. On this subject generally, the supreme court of Pennsylvania remarks (Fitzsimmons' Appeal, 4 Pa. St. 248–250), very properly we think, that "the duties of an auditor are a necessary and often a very important part of the administration of justice. In the orphans' court the duties are in many respects similar to those of a master in chancery, and in the common pleas they are required to perform onerous and responsible services. Diligence, intelligence and discretion are required; and unless these essential qualities are present the actual labour expended will often be useless. . . . Unless suitable compensation is given, this useful function of the law cannot be fulfilled; for men of capacity and usefulness will not be found willing to expend their time for the benefit of others without some reward. Everywhere in the commonwealth courts have authorized and sanctioned a reasonable allowance; and unless that practice is continued, the interest of creditors, of widows and orphans, of executors and administrators, and indeed the entire public, which is always concerned in the intelligent administration of the laws, will suffer detriment."

The law has established no rate of fees to be allowed as compensation to auditors, masters in chancery, &c. Hence the court has no rule by which to measure the charge. The law could not well fix a standard that would be just in all cases: nor can the court. The services of men of learning, skill and experience in their professions are not to be rated like those of day labourers. It is a question of great delicacy for the court to be called on to judge of what is a proper compensation for them. The facts of the case, from their character, cannot be sufficiently brought, or very decently discussed before the court, nor the compensation tested by any certain rule; and this last point must generally be submitted to the candour and judgment of the members of a profession eminent, among all others, for honour and integrity.

It is said that gentlemen of the Philadelphia bar usually charge from $10 to $50 for an advice or opinion. This may be true in small matters of daily occurrence. But I think that few gentlemen of the bar in this city would prepare notices, see them correctly printed and duly published, would afterwards attend four days to meet the parties and their counsel, and then spend at least as many more in writing out a long, learned and elaborate opinion, in a case where many thousands of dollars were in contest, for any such compensation. Every gentleman of the bar well knows that there cannot be any one rule of charges in the nature of a horizontal tariff for all cases. Often, where the parties are poor and the matter in contest is small, counsel receive but very inadequate compensation for their exertion of body and mind; and for myself I know that for some of the most severe labour of my professional life I have been the least well paid. In other cases, where the parties are wealthy, and the sum in controversy large, they will receive a tenfold greater compensation for perhaps a tithe of the same labour. In some cases the whole sum in dispute would be poor compensation. In others, five per cent. of it will be very liberal. Hence, in all cases, professional compensation is gauged not so much by the amount of the labour, as by the amount in controversy, the ability of the party, and the result of the effort. And this is perfectly just.

In this case before us, if the sum to be disposed of by the auditor had been $1,000, one tenth of his present charge would be 2¼ per cent. of the fund, and yet it would have been a very inadequate compensation for several days of professional labour and investigation, to say nothing of the merely mechanical duties which all auditors have to perform alike, and which, though not requiring great ability, distract attention and employ time. In the present case the charge is considerably below the half of one per cent. upon the fund to be distributed. The labour, learning and professional character

requisite to perform the duty committed to the auditor in this case was tenfold of that required of the clerk for every service which he has rendered in the suit, and yet the law, by allowing him a percentage of a half of one per cent. on the money in court, has given him a sum nearly a third larger than that charged by the auditor. And he has had besides a fee for each particular service.

Seeing, therefore, that the fees and emoluments allowed by law to its officers, are estimated by a compound ratio one of whose multiples is the sum in controversy, as well as the actual labour bestowed, we cannot say that the charge of the auditor is so extravagant as to call for interference from the court.

The allegation that the case was not argued by counsel before the auditor, is no ground for lessening his compensation, since its only effect was to impose upon him the necessity of investigations which would otherwise have been made by the counsel. And the case is not altered by the assertion that he might have made a pro forma decree; since the nature of the reference and the order of the court imposed upon him the duty of examining the subject and reporting the result of his investigations to the court for its relief; a task which he has performed with learning and good judgment. Exception overruled.

[This case was taken up by writ of error to the supreme court, where the judgment of this court was affirmed. 9 How. (50 U. S.) 530.]